UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| INDIANA PROTECTION AND ADVOCACY SERVICES COMMISSION, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) No. 1:22-cv-00906-JRS-TAB<br>) |
| INDIANA FAMILY AND SOCIAL SERVICES ADMINISTRATION, et al., | )<br>)<br>) |
| Defendants. | )<br>) |

**Order on Motion for Preliminary Injunction**

## I.     Introduction

This is a civil rights case. Plaintiff Indiana Protection and Advocacy Services Commission ("IPAS"), an administrative chimera born of state and federal statute,[1] represents the interests of people with mental and developmental disabilities. Defendants are various Indiana agencies, subagencies, and officials (collectively, "the State") charged, *inter alia*, with providing competency restoration services for criminal defendants found incompetent to stand trial. IPAS, on behalf of incompetent criminal defendants, claims that the State has failed to provide timely competency restoration services, in violation of the Fourteenth Amendment; Title II of the

---

[1] In IPAS' own words: "Indiana Protection and Advocacy Services Commission ("IPAS") is an entity, created under Indiana Code § 12-28-1-1, *et seq.*, pursuant to federal mandate and funded through federal monies, to represent, advocate for and protect the rights and interests of individuals with mental illness, developmental disabilities, and other disabilities. IPAS is the federally-mandated and state-designated Protection and Advocacy system ("P&A") for the state of Indiana, as that term is defined under the Developmental Disabilities Assistance and Bill of Rights Act ("DD Act"), 42 U.S.C. § 150141, *et seq.*, the Protection and Advocacy for Individuals with Mental Illness Act of 1986 ("PAIMI Act"), 42 U.S.C. § 10810, *et seq.*, and the Protection and Advocacy of Individuals Rights Act ("PAIR Act"), 29 U.S.C. 794e, *et seq.*" (Compl. ¶ 9, ECF No. 1.)

Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.; and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

Now before the Court is IPAS' Motion for Preliminary Injunction, (ECF No. 11).

## II.     Background

The basic facts are not in dispute:

An Indiana court that suspects a criminal defendant not to be competent to stand trial must hold a competency hearing. (Pl.'s Memo. Supp. Motion for Prelim. Injunction 2, ECF No. 22.) The competency hearing is an adversarial, evidentiary hearing: each side may have counsel, argue, and present evidence. (Defs.' Response 3, ECF No. 23.) Indiana law requires that two or three disinterested medical professionals, including at least one mental health professional, be present to advise the court. (*Id.*) If the court finds the defendant incompetent to stand trial, the court must order the defendant committed to the State's mental health agency for competency restoration services. (*Id.*)

"Competency restoration services" is an umbrella term for a range of mental health treatments. (Pl.'s Memo. 3, ECF No. 22.) The State must decide for each defendant where best to provide those services. The State provides competency restoration services in three 'placements': at state-run psychiatric hospitals, by contract at private hospitals, and in jail. (*Id.*) The state-run hospitals have by far the greatest capacity. (Defs.' Response 8–10, ECF No. 23.)

At present the State cannot immediately provide competency restoration services to all defendants committed to its care. The state-run hospitals are full; the other

2

two placements are quite limited. There is a waitlist. (Pl. Memo 7, ECF No. 22.) Criminal defendants on the waitlist are generally in jail[2] pending placement in competency restoration services. (*Id.* at 9–12.) The wait for state hospital placements averages 22 to 83 days, depending on the hospital. (*Id.* at 8.) These wait times are the subject of this case.

(Once defendants have been placed in competency restoration services, the process moves quickly: by law, the State has 90 days to assess whether competency restoration is likely; if it finds restoration is likely, it is allowed to hold the defendant in treatment for six months attempting restoration. If competency is restored, the defendant goes to trial. If competency restoration is initially found unlikely, or if restoration is not achieved after six months trying, the defendant is shunted into civil commitment proceedings, or released. (Defs.' Response 5, ECF No. 23, citing Ind. Code § 35-36-3.))

### III. Legal Standard

"A preliminary injunction is 'an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it.'" *Cassell v. Snyders*, 990 F.3d 539, 544 (7th Cir. 2021) (quoting *Orr v. Shicker*, 953 F.3d 490, 501 (7th Cir. 2020)). Therefore,

> To obtain a preliminary injunction, a plaintiff must show that: (1) without this relief, it will suffer 'irreparable harm'; (2) 'traditional legal remedies would be inadequate'; and (3) it has some likelihood of prevailing on the merits of its claims. . . . If a plaintiff makes such a

---

[2] The parties have not adequately explained how or why the defendants are in jail, only that they are. (Pl. Memo 10 n. 6, ECF No. 22.) Are these defendants, previously at liberty, first sent to jail after the competency hearing? Or are these defendants, already in pretrial detention, simply kept where they are? The Court discusses the implications in Section IV.C, below.

> showing, the court proceeds to a balancing analysis, where the court must weigh the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the court were to grant it.

*Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020), cert. denied, 211 L. Ed. 2d 9, 142 S. Ct. 69 (2021) (citing *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020) and *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018)) (internal citations omitted). The burden of making this showing is on the party seeking the injunction. *Speech First*, 968 F.3d at 637–38.

### IV.   Discussion

#### A. Standing

The State argues that IPAS lacks standing. (Defs.' Response 18–22, ECF No. 23.) Standing is a constitutional requirement for this Court's jurisdiction:

> The Constitution limits federal courts to deciding "Cases" and "Controversies." Among other things, that limitation requires a plaintiff to have standing. The requisite elements of Article III standing are well established: A plaintiff must show (1) an injury in fact, (2) fairly traceable to the challenged conduct of the defendant, (3) that is likely to be redressed by the requested relief.

*Fed. Election Comm'n v. Cruz*, 142 S. Ct. 1638, 1646 (2022) (citing Art. III, § 2 and *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).  Here, IPAS acknowledges it lacks "organizational standing" because it does not itself have 'injury in fact'; rather, it asserts "associational standing" to redress injuries sustained by the mentally disabled people it represents. (Pl. Reply 3–8, ECF No. 24.)

4

i.  Associational Standing

The lead case in this circuit to have considered the associational standing of statutory protection and advocacy groups like IPAS applied the *Hunt* elements, under which an organization has standing if "(1) its members would otherwise have standing to sue in their own right, (2) the interests it seeks to protect are germane to the organization's purpose, and (3) neither the claims asserted, nor the relief requested, requires the participation of individual members in the lawsuit." *Disability Rts. Wisconsin, Inc. v. Walworth Cnty. Bd. of Supervisors*, 522 F.3d 796, 801–02 (7th Cir. 2008) (citing *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).  Applying those elements, the Seventh Circuit found that Wisconsin's IPAS equivalent would have had associational standing if it had been able to show a constituent with an injury in fact.  *Id.*

Here, there is no dispute that the second and third *Hunt* elements are met. Instead, the State argues that the incompetent criminal defendants for whom IPAS purports to speak are not "members" of IPAS, and that even if they are, IPAS has "failed to identify a single individual with standing to sue in his or her own right." (Defs.' Response 22, ECF No. 23.)

The latter argument can quickly be dismissed.  It turns on a technicality: the State does not argue that any of the incompetent criminal defendants would lack individual standing.  It is undisputed each does have standing.  Rather, the State argues that IPAS has failed to name one.  But IPAS need not provide a name, *Disability Rts. Wisconsin*, 522 F.3d at 802, so long as it can point to at least one specific person with

5

an injury in fact, *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1010 (7th Cir. 2021). IPAS has done so. (Pl.'s Reply 7, ECF No. 24.)

The first argument is weightier. The Seventh Circuit in *Disability Rights Wisconsin* did not address the question presented here—whether an advocacy group's constituents count as "members" for the first *Hunt* element—because the parties there conceded that the protection and advocacy organization was "an advocacy group able to bring suit on behalf of its members." *Disability Rights Wisconsin*, 522 F.3d at 803. The Southern District of Indiana has previously found associational standing for IPAS without directly addressing this issue. *Indiana Prot. & Advoc. Servs. Comm'n v. Comm'r, Indiana Dep't of Correction*, 642 F. Supp. 2d 872, 880 (S.D. Ind. 2009). The parties, then, turn to out-of-circuit cases, which are split. *Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101 (9th Cir. 2003) (finding disabled persons are effectively "members" of advocacy organization created to vindicate their rights); *Doe v. Stincer*, 175 F.3d 879 (11th Cir. 1999) (same); *Ass'n for Retarded Citizens v. Dallas County*, 19 F.3d 241 (5th Cir. 1994) (finding disabled persons are not "members" of advocacy group).

The Court first notes that the *Hunt* test is not a statute but a case-law test, and "the language of an opinion is not always to be parsed as though we were dealing with language of a statute." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979). The mention of "members" in the *Hunt* elements is not a command from the legislature.

The *Hunt* elements are the Supreme Court's reiteration of associational standing requirements first described in *Warth v. Seldin*, 422 U.S. 490 (1975). *Hunt*, 432 U.S.

6

at 342. The *Warth* Court addressed the associational standing of three voluntary membership organizations: one a political advocacy group and the other two trade associations. *Warth*, 422 U.S. at 510–11. It was therefore natural to discuss associational standing in terms of "members." But the *Hunt* Court addressed the associational standing of a state agency, the Washington State Apple Advertising Commission, which was "not a traditional voluntary membership organization such as a trade association" because it "ha[d] no members at all." *Hunt*, 432 U.S. at 342. The Court held that "the Commission's status as a state agency, rather than a traditional voluntary membership organization," nonetheless did not "preclude[] it from asserting the claims of the Washington apple growers and dealers who form its constituency." *Id.* at 344. The Court reasoned that the growers had all "the indicia of membership in an organization" and that "the Commission represents the State's growers and dealers and provides the means by which they express their collective views and protect their collective interests." *Id.* at 344–35.

Other courts to have considered this issue read *Hunt* to require, if not "members," at least some relationship between an organization and its constituents that has the "indicia of membership"; those courts have found "indicia of membership" present in protection and advocacy systems like IPAS. *See, e.g.*, *Oregon Advocacy Center*, 322 F.3d at 1109–11, *Stincer*, 175 F.3d at 886, and *New Jersey Prot. & Advoc., Inc. v. Davy*, No. CIV. 05-1784(SRC), 2005 WL 2416962, at *3 (D.N.J. Sept. 30, 2005). This Court notes that IPAS, like its sister-state counterparts, is required by statute to have its constituents participate on the organization's board, advisory council, and

7

grievance procedures. *See generally* 42 U.S.C. § 10805. The Court thus agrees that IPAS, like the commission in *Hunt* and like the protection and advocacy systems considered in other courts' decisions, has sufficient "indicia of membership" to fit it within the *Warth* framework for associational standing.

Alternately, this Court thinks associational standing under *Hunt* might be appropriate even without "indicia of membership." The *Hunt* Court found those indicia, and so did not indicate whether standing would have failed without them. But the Court there noted that in addition to "indicia of membership," "the [Apple Marketing] Commission represents the State's growers and dealers and provides the means by which they express their collective views and protect their collective interests." *Hunt*, 432 U.S. at 345. *Mutatis mutandis*, IPAS fits that reasoning exactly. Protection and advocacy systems were created by Congress to vindicate the rights of their constituents. 42 U.S.C. § 10801(a)(1), (b)(1), (b)(2)(A). The systems are thus designed to "protect . . . collective interests." *Hunt*, 432 U.S. at 345. If the core of associational standing is not "membership" but rather the propriety of collective representation, then the constituent-advocacy group relationship alone might suffice for associational standing, assuming always that there is some underlying injury in fact. *Cf. Nat'l Motor Freight Traffic Ass'n v. U.S.*, 372 U.S. 246 (1963) (finding standing for statutorily-authorized motor carriers associations where those associations are "proper representatives of the interests of their members").

8

             ii.  Statutory Standing

Finally, the Court observes that IPAS has standing independently of the *Hunt* test for associational standing. The Court repeats its proposition from *Indiana Protection & Advocacy Services* that Congress has at least some power to grant standing by saying so. *Indiana Prot. & Advoc. Servs.*, 642 F. Supp. 2d at 877 (citing *Director, Office of Workers' Compensation Programs v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 129–30 (1995)). Congress may not override the "constitutional" aspects of standing, but it may override the "prudential" aspects. *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 551 (1996). The line between constitutional and prudential standing is admittedly not clear. *Id.* at 555 (citing *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471 (1982)). But, as the Supreme Court observes,

> "[T]he general prohibition on a litigant's raising another person's legal rights" is a "judicially self-imposed limit on the exercise of federal jurisdiction," not a constitutional mandate. Indeed, the entire doctrine of "representational standing," of which the notion of "associational standing" is only one strand, rests on the premise that in certain circumstances, particular relationships (recognized either by common-law tradition or by statute) are sufficient to rebut the background presumption (in the statutory context, about Congress's intent) that litigants may not assert the rights of absent third parties.

*Id.* at 557 (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). The Court gave two examples of statutory grants of standing: Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-5 (EEOC commissioner entitled to pursue legal remedies on behalf of "aggrieved person.") and the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*

9

(Secretary enabled to bring civil enforcement action). *United Food*, 517 U.S. at 557 n.8.

Here, IPAS has a "particular relationship[] . . . recognized . . . by statute" that seems "sufficient" to allow it to "assert the rights of absent third parties." IPAS' governing statute gives it "the authority to . . . pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State." 42 U.S.C. § 10805(a). That sounds to this Court like a grant of third-party standing. Nor is this Court alone in so thinking. *Oregon Advoc. Ctr.*, 322 F.3d at 1110 ("[W]e accept OAC's argument that Congress intended to confer standing to pursue suits like this one on organizations like OAC."); *Indiana Prot. & Advoc. Servs. Comm'n*, 642 F. Supp. 2d at 877 ("Congress has the ability to grant . . . standing by saying so. . . . As part of the PAIMI, as with these other statutes, Congress has said so.") (internal citations and quotations omitted). That statutory grant of standing to IPAS does not run afoul of the constitutional minimum "allegation[] of injury" where, as here, IPAS steps into the shoes of its injured constituents. *Cf. Disability Rts. Wisconsin*, 522 F.3d at 801 n.3 ("No statutory regime can override a constitutional requirement in order to repair insufficient allegations of injury.").

The Court thinks the IPAS standing analysis could in the future be a short one: Congress gives IPAS statutory standing to bring claims on behalf of its injured constituents. Constitutional standing requires only that those constituents in fact be

injured; if injury is alleged, the suit may proceed.[3]  The *Hunt* test would only be called into play for associations that lack statutory standing.

### B. *Younger* Abstention

The State next argues that this Court should apply *Younger* abstention and refuse jurisdiction over this case. (Defs.' Response 18–22, ECF No. 23.)

*Younger* abstention, though, applies where "federal jurisdiction has been invoked for the purpose of restraining state criminal proceedings." *Colorado River Water Conservation Dist. v. U.S.*, 424 U.S. 800, 816 (1976) (citing *Younger v. Harris*, 401 U.S. 37 (1971)).  That is not the case here.  IPAS challenges the State's delay in placing incompetent criminal defendants into competency restoration services.  IPAS does not seek to impede state criminal proceedings; if anything, the result it seeks would expedite those proceedings.  The Court will therefore honor its "virtually unflagging obligation . . . to exercise [its] jurisdiction" and decline *Younger* abstention here.  *Id.* at 817.

### C. Likelihood of Success

Proceeding now to the merits, the Court notes that of the three threshold requirements for a preliminary injunction, the parties dispute only the "likelihood of success on the merits"; apparently the State concedes "irreparable harm" and "inadequacy of legal remedies." *See Mays*, 974 F.3d at 818.  (Pl. Memo 18–28, ECF No. 22; Defs.' Response 27–32, ECF No. 23.)

---

[3] The Court notes that the standing analysis starts to sound very much like the analysis for Rule 12(b)(6) "failure to state a claim."  Whether the two are in fact identical is a question for another day.

11

The legal standard is clear: "a plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits." *Mays*, 974 F.3d at 822 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

The parties believe this case to be controlled by the Supreme Court's decision in *Jackson v. Indiana*, 406 U.S. 715 (1972). In *Jackson*, a criminal defendant was found incompetent to stand trial and committed to the State's mental health division "until . . . sane." *Id.* at 719. Defense counsel argued that commitment "until sane" was effectively indefinite for this defendant, who was so disabled he was unlikely ever to be found competent to stand trial. *Id.* The Court agreed. It held that Equal Protection demands criminal defendants be treated like non-criminal-defendants for commitment purposes—that is, that they be given the benefit of adversarial civil commitment procedures before being indefinitely committed to the care of the state. *Id.* at 723–24. The Court further held that the Fourteenth Amendment Due Process clause prohibits the "indefinite commitment of a criminal defendant solely on account of his incompetency to stand trial." *Id.* at 731. Instead, the Court reasoned, indefinite commitment must be justified by one or more of Indiana's statutory bases for indefinite commitment—capacity to function, dangerousness, or chance of attaining competency. *Id.* at 738. Therefore, the Court concluded,

> a person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future. If it is determined that this is not the case, then the State must either institute the customary civil commitment proceeding that would be required to commit indefinitely any other citizen, or release the defendant.

12

*Id.* In response to the *Jackson* decision, Indiana introduced its current statutes governing incompetent criminal defendants and competency restoration services. Ind. Code § 35-36-3. Those statutes parallel the conclusion of *Jackson* as just quoted. *Id.* As described in Section II, above, Indiana now requires that incompetent criminal defendants committed to the state mental health agency be tried, referred to civil commitment procedures, or released within six months of beginning treatment. *Id.*

The Court is not persuaded that *Jackson* controls this case. *Jackson* decided, in effect, that competency restoration services cannot go on indefinitely. No one here argues they do. This case concerns the waiting period after a defendant has been found incompetent but before competency restoration services begin. Apparently, the defendant waits in jail. (The alleged injuries, indeed, arise from jails' failures to provide adequate mental health services; these injuries would not arise were the defendants at liberty while awaiting placement.)

Neither party, though, has explained—what seems to the Court potentially dispositive of the case—why the defendant waits in jail and not at liberty.[4] Is the defendant first sent to jail after being found incompetent, there to await placement? Or was the defendant already in jail on pretrial detention and simply kept there? In other words, after the state court's competency hearing, does the commitment of the

---

[4] The Court has scrutinized factually analogous cases for hints. Most decisions say what the parties here say: that the defendants are "detained in county jails awaiting admission" to services, without further explanation of when or why the detention began. *See, e.g., Oregon Advoc. Ctr. v. Mink*, No. CV 02-339-PA, 2002 WL 35578910, at *6 (D. Or. May 10, 2002). Some suggest a continuing detention rather than new detention results from an incompetency finding and order of commitment. *Disability L. Ctr. v. Utah*, 180 F. Supp. 3d 998, 1002 (D. Utah 2016), *Trueblood v. Washington State Dep't of Soc. & Health Servs.*, 101 F. Supp. 3d 1010, 1016 (W.D. Wash. 2015). Others suggest that commitment to a mental health agency is in fact a new detention. *See e.g., Terry ex rel. Terry v. Hill*, 232 F. Supp. 2d 934, 936 (E.D. Ark. 2002).

13

defendant to the state mental health agency effect a new detention, or is the commitment merely formal, such that only existing detentions are continued? If the former, *Jackson's* principles, at least, apply, because the detention is justified by the finding of incompetency. *Jackson* dictates that the detention be tailored, in both length and nature, to its purpose: restoring competency. If the latter, though, the detention predates the incompetency finding and is justified by some independent ground. It must conform to the other constitutional requirements for pretrial detention, of course, but *Jackson* makes no special demands.

IPAS argues that the wait times at issue here violate the due process requirements set forth in *Jackson*. (Pl. Reply 13–15, ECF No. 24.) IPAS cites in support various factually analogous cases in other jurisdictions that have held in its favor. (*Id.*) But those cases, persuasive authority though they are, do not address the Court's doubt, described above, about whether *Jackson* applies to the detentions at issue here. Indeed, IPAS' lead case, *United States v. Donnelly*, 41 F.4th 1102 (9th Cir. 2022), concerns the continuing detention scenario this Court thinks is best handled under ordinary pretrial detention caselaw. The defendant there was "detained without bail under 18 U.S.C. § 3142 as both a danger to the community and a flight risk." *Id.* at 1103. Those justifications for pretrial detention are not, to this Court's preliminary view, cut off by a finding of incompetency: what was a justifiable detention before the competency hearing remains justifiable after. At some point, of course, the detention will drag on too long, but that is a question of speedy trial rights, not a question of "indefinite commitment" by the State's mental health arm.

Even if *Jackson* does apply, the Court is not persuaded that the wait times at issue here violate due process. *Jackson* held that "the nature and duration of commitment [must] bear some reasonable relation to the purpose for which the individual is committed." 406 U.S. at 738. Here, the detentions are "reasonably related" to the purpose of providing competency restoration services: there are more defendants found to need services than there are services available—some defendants must wait. Again, there is some wait time that would be clearly too long, but IPAS has not shown that these wait times are. *Jackson* does not apply itself. It counsels reasonableness and rejects "arbitrary time limits." *Id.* at 738. Without more from IPAS to show that *Jackson's* reasonableness requirement prohibits the State's conduct here, the Court cannot conclude that their success is likely.

IPAS also argues that the State's delay in providing competency restoration services violates substantive due process. (Pl. Reply 15–16, ECF No. 24.) This argument is made explicit for the first time in the reply brief. (*Id.*) Under *Youngberg v. Romeo*, wards of the state are entitled to at least "minimally adequate" care. 457 U.S. 307, 322 (1982). IPAS argues that jails do not provide "minimally adequate" mental health services to incompetent criminal defendants awaiting placement. It points to two deficiencies: first, that jails do not have "involuntary medication orders" and second, that jails may isolate the mentally ill to control their behavior or protect them from harm. (Pl. Memo 10–11, ECF No. 22.) The Court thinks those deficiencies show jails' mental health treatment is not optimal—the relevant standard, though, is not "optimal" but "minimally adequate." And the very deficiencies argued by IPAS

15

indicate that jails' mental health treatment is minimally adequate: the argument that jails do not have involuntary medication orders suggests that jails do administer voluntary medications; the argument that jails isolate the mentally ill for their protection suggests that jails do take steps to prevent violence against those in their care. The Court is prepared to revisit the substantive due process question later, with the benefit of more briefing and a better-developed evidentiary record. On the motion for preliminary injunction, however, IPAS has failed to carry its burden of showing it is likely to succeed on the merits.

## V.   Conclusion

IPAS has a statutory grant of standing from Congress to seek relief on behalf of its injured constituents. Its suit here is within the Court's subject-matter jurisdiction and is not barred by *Younger* abstention.

On the merits, though, IPAS has failed to carry its burden of showing a likelihood of success on the merits. *Jackson* does not dispose of this case so neatly as IPAS would hope, and IPAS' alternate arguments are not so well developed as to persuade this Court of their likely success.

IPAS' Motion for Preliminary Injunction, (ECF No. 11), is therefore **denied.**

**SO ORDERED.**

Date: 09/26/2022

_____
JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution by CM/ECF to registered counsel of record.